IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:10-CT-3082-FL

| | |
|---|---|
| JOHNNY LEE LEONARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | ORDER |
| ) | |
| NORTH CAROLINA DIVISION OF ) | |
| ADULT CORRECTION;[1] DR. ROBERT ) | |
| OWENS; AND DR. DONALD V. ) | |
| MICKLOS,[2] ) | |
| ) | |
| Defendants. ) | |

The matter comes before the court on the respective motions for summary judgment filed by Dr. Donald V. Micklos (DE # 59) and Dr. Robert Owens ("Owens") (DE # 63) pursuant to Federal Rule of Civil Procedure 56, and their respective motions for leave to file excess pages (DE #s 57, 58). Plaintiff responded with a motion to appoint counsel (DE # 67). Defendants did not respond to plaintiff's motion to appoint counsel. In this posture, the matters are ripe for adjudication. For the following reasons, the court grants defendants' motions and denies plaintiff's motion.

---

[1] Effective 1 January 2012 the State of North Carolina reorganized and consolidated a number of executive agencies. The Department of Correction was subsumed into the Department of Public Safety and is now the Division of Adult Correction. See N.C. Gen. Stat. §§ 143B-600(a)(1); -700 et seq.

[2] Dr. Donald V. Micklos informed the court that plaintiff incorrectly referred to him as Dr. Micklas. The court hereinafter will refer to this defendant as Dr. Donald V. Micklos.

## STATEMENT OF THE CASE

On May 28, 2010, plaintiff, a state inmate, filed this action pursuant to 42 U.S.C. § 1983. Plaintiff alleged defendants, as well as the North Carolina Department of Adult Correction ("DAC"), acted with deliberate indifference to his medical needs in violation of the Eighth Amendment to the United States Constitution. The DAC subsequently moved to dismiss plaintiff's complaint against it for failure to state a claim upon which relief may be granted, which this court granted.

On September 14, 2011, Micklos filed a motion for summary judgment, arguing that plaintiff failed to exhaust his administrative remedies before filing this action. Alternatively, Micklos argues that plaintiff's claim is without merit. Owens filed a separate motion for summary judgment, arguing that plaintiff's claim is meritless. In response, plaintiff filed a motion to appoint counsel.

## STATEMENT OF FACTS

Viewing the facts in the light most favorable to plaintiff, plaintiff makes the following allegations. Plaintiff was transferred to Pender Correctional Institution ("Pender") on May 15, 2007. Micklos Aff. ¶ 5 and Ex. 2. The next day, Micklos examined plaintiff, and learned plaintiff had a history of a brain cyst. Id.

On May 17, 2007, Micklos again examined plaintiff in response to a request from nursing staff to check plaintiff's shunt and valve.[3] Id. ¶ 6 and Exs. 2 and 3. Micklos noted that plaintiff was transferred to Pender with a PULHEAT[4] of one (normal) across all areas. Id. Micklos noted that plaintiff was scheduled for an evaluation in two weeks at the Central Prison Neurology Clinic. Id.

---

[3] A shunt is commonly used to relieve pressure inside the skull due to excess cerebrospinal fluid. Id. ¶ 6.

[4] A "PULHEAT" is a medical examination performed upon incarceration and then periodically thereafter. "PULHEAT" stands for the following areas of examination: (P) Physical capability; (U) Upper extremities; (L)Lower extremities; (H) Hearing; (E) Eyes; (A) Activity; (T) Transportation. Id. ¶ 6.

Micklos further noted that plaintiff recently had blockage of his shunt and had underwent a procedure to drain cerebrovascular spinal fluid. Id. Micklos completed a new PULHEAT to reflect plaintiff's history of neurosurgery for brain tumor and shunt placement, as well as noted his activity restrictions. Id. Micklos also noted that reasonable limits should be placed on plaintiff's activity and that he may require special transportation needs. Id.

On May 29, 2007, Dr. Cheryl McNeil ("McNeil") examined plaintiff in the Central Prison neurology clinic pursuant to his scheduled appointment. Id. ¶ 8 and Ex. 5. McNeil noted that plaintiff had a history of psychosis, brain cyst, and hydrocephalus (build up of cerebrospinal fluid in the ventricles of the brain), as well as bilateral subdural hemorrhages (blood gathering between the dura matter of the brain). McNeil further noted that she was not able to conduct a complete evaluation of plaintiff's condition because she did not have the proper medical records. Id. At the conclusion of the exam, McNeil found that plaintiff had decreased memory and recommended the following: (1) finish previously prescribed antibiotic medication; (2) check Dilantin level five days after finishing antibiotics; (3) adjust Dilantin dose to keep the level between ten (10) to twenty (20);[5] and (4) schedule a follow-up appointment at the neurology clinic in four to six weeks with plaintiff's old films and volume one of his medical chart. Id.

On May 30, 2007, Micklos checked plaintiff's Dilantin level, and discovered it was outside of the normal range. Id. ¶ 9 and Ex. 6. In response, Micklos ordered that plaintiff's Dilantin dosage be increased. Id.

On June 9, 2007, plaintiff was transported to Pender Memorial Hospital after seizure activity,

---

[5] Dilantin levels are monitored to ensure that the level of anti-seizure medication is therapeutic and that plaintiff takes the Dilantin according to his prescription. Id. ¶ 8. The therapeutic drug level in most patients is between ten (10) and twenty (20) milliliters.

3

and complaints of subsequent chest pain. Id. ¶ 10 and Ex. 7. Medical staff at the hospital performed a head computed tomography ("CT") scan. Id. The CT scan was negative for bleeding, but showed a dilated atrium and temporal horn of the left lateral ventricle due to a possible shunt malfunction. Id. Plaintiff's electrocardiography test and Dilantin levels were normal. Id. The emergency department physician diagnosed plaintiff with possible seizure with probable shunt malfunction. Id. Plaintiff was discharged from the hospital the following day. Id.

On June 11, 2007, Micklos examined plaintiff as a follow-up to plaintiff's hospital visit. Micklos diagnosed plaintiff with questionable problems with plaintiff's cerebral shunt, and increased neurological weakness secondary to the probable shunt blockage. Id. ¶ 11 and Exs. 6 and 8. Micklos referred plaintiff to the neurology clinic. Id. An appointment with the University of North Carolina Neurology Clinic was scheduled. Id.

On June 14, 2007, Micklos ordered plaintiff transferred to Central Prison Hospital after consulting with the mental health department. Id. ¶ 12 and Exs. 6 and 9. On the same date, the psychiatric clinic evaluated plaintiff. Id. The psychiatric clinic staff determined that plaintiff's mental health had deteriorated, and that he needed inpatient treatment. Id.

Plaintiff's neurological condition continued to be monitored while he was incarcerated at Central Prison. Id. Specifically, on July 16, 2007, plaintiff had a CT scan of his head. Id. Plaintiff also was seen by a neurosurgeon and/or neurologist to evaluate the possibility of a malfunction of his shunt. Id. Neurosurgery recommended that plaintiff be examined by an ophthalmologist to rule out any evidence of increased intracranial pressure, which might be indicated if plaintiff had papilledema (optic disc swelling that is caused by increased intracranial pressure). Id. On July 30, 2007, plaintiff was examined at the Central Prison Ophthalmology Clinic, where papilledema was

4

ruled out, decreasing any suspicion of shunt malfunction. Id. On August 14, 2007, the physician at the Central Prison Nuclear Medicine department determined that because plaintiff had no papilledema, the suspicion of increased intracranial pressure was very low, and no further work-up was warranted. Id. ¶ 12 and Exs. 6 and 9.

Plaintiff was transferred back to Pender on January 22, 2008. Id. ¶ 13. Micklos examined plaintiff on January 28, 2008, in follow-up to his transfer. Id. ¶ 15 and Ex. 12. Micklos noted that plaintiff was at risk for a seizure at any time. Id. Micklos recommended a possible revision of plaintiff's shunt to move it to the left side of his brain. Id.

On January 31, 2008, Micklos examined plaintiff and found plaintiff to have a headache secondary to his history of hematoma and intracranial bleed with shunt. Id. ¶ 16 and Ex. 13. Micklos referred plaintiff for an appointment with the University of North Carolina Neurology Clinic on March 10, 2008. Id. Plaintiff refused the appointment. Id.

On February 29, 2008, Micklos entered a telephone order directing that plaintiff be transported to the Pender Memorial Hospital after plaintiff was found having a seizure, and was unresponsive to all verbal and tactile stimulation. Id. ¶ 18 and Ex. 15. At the hospital, plaintiff was examined and diagnosed with possible pseudoseizures.[6] Id.

On March 3, 2008, Micklos examined plaintiff in follow-up to his emergency hospital visit and discussed the status of plaintiff's shunt. Id. ¶ 19, Exs. 15 and 16. Micklos diagnosed plaintiff with post-seizure activity, and reminded plaintiff that he had an appointment at the University of North Carolina Neurology Clinic on March 10, 2008. Id. However, on March 7, 2008, plaintiff

---

[6] Pseudoseizures are attacks resembling epileptic seizures but having purely psychological causes, lacking the electroencephalographic changes of epilepsy and sometimes able to be stopped by an act of will. Id. ¶ 7.

5

signed a refusal form refusing his scheduled appointment at the University of North Carolina Neurology Clinic. Id. ¶ 20 and Ex. 17. Plaintiff's appointment at the neurology clinic was rescheduled for May 6, 2008. Id. ¶ 22 and Exs. 16 and 18.

On May 6, 2008, McNeil saw plaintiff at the University of North Carolina Neurology Clinic. Id. ¶26 and Exs. 19, 21. McNeil noted concern with plaintiff's changing skull shape. McNeil, however, noted that plaintiff was not considered a surgical candidate by the University of North Carolina Department of Neurosurgery or by his prior neurosurgeon. Id. McNeil recommended that plaintiff be continued on his current dosage of Dilantin and Klonopin, and that he be started on Topamax. Id. McNeil also recommended a follow-up appointment at the University of North Carolina Neurology Clinic for medication adjustment in two months. Finally, McNeil ordered Vicodin for pain management if permitted by custody. Id. In response, Micklos ordered a check of plaintiff's Dilantin level, ordered the Topamax, and scheduled a follow-up appointment with the neurology clinic on July 8, 2008. Id.

On May 4, 2008, Micklos examined plaintiff in response to plaintiff's sick call request complaining about headaches which were not relieved by Excedrin. Id. ¶ 27 and Exs. 19 and 22. Micklos noted that plaintiff had persistent headache pain due to problems with his shunt. Id. Micklos noted that he did not believe Vicodin was necessary, and that he preferred to try other medications first. Id. Plaintiff subsequently submitted another sick-call request complaining that his prescribed pain medication was not relieving his headache pain, and requested the Vicodin that was prescribed by the neurologist. Id. ¶ 31 and Ex. 24. In response, Micklos prescribed plaintiff Vicodin. Id.

On July 8, 2008, McNeil examined plaintiff at the University of North Carolina Neurology

6

Case 5:10-ct-03082-FL Document 69 Filed 08/22/12 Page 6 of 20

Clinic. Id. ¶ 34 and Ex. 27. McNeil noted that the Topamax she previously prescribed added only modest benefit to both the seizures and headaches. Id. McNeil noted that plaintiff still was having auditory hallucinations, but that his visual hallucinations had resolved since he started on new antipsychotic medications. Id. McNeil recommended the following: (1) increase Topamax to one hundred (100) milligrams per day; (2) continue Vicodin for pain management; (3) repeat head CT scan with comparison of films from his prior CT scan so that plaintiff could be sent back to neurosurgery if there was any dramatic changes; (4) request that CT films be provided for next neurology clinic appointment; and (5) schedule a follow-up appointment with the neurology clinic for medication adjustment in three months. Id. In response, Micklos implemented McNeil's recommendations. Id. ¶ 35 and Exs. 26 and 28.

Plaintiff's CT scan was performed on August 19, 2008. Id. ¶ 38 and Ex. 31. The results reflected that plaintiff's cystic lesion was of a stable size, and had decreased slightly from the previous CT scan. Id. The CT scan also revealed a slightly increased amount of fluid collection and no evidence of acute hemorrhage. Id.

On September 22, 2008, plaintiff submitted a sick call request complaining that his condition was deteriorating. Id. ¶ 41 and 34. Micklos examined plaintiff the same day, diagnosed him with chronic headaches, and prescribed medication to treat plaintiff's condition. Id.

On October 9, 2008, plaintiff was transferred from Pender to Maury Correctional Institution ("Maury"). Owens treated plaintiff while plaintiff was incarcerated at Maury. Id. ¶ 43. Owens saw plaintiff for the first time on October 10, 2008. Owens Aff. ¶ 8. Owens noted plaintiff's history of seizures and a questionable component of pseudo seizures. Id. ¶ 8. Owens also noted that plaintiff had a large intracranial cyst and chronic subdural hematoma. Id. After examining plaintiff, Owens'

7

Case 5:10-ct-03082-FL Document 69 Filed 08/22/12 Page 7 of 20

assessment was a seizure disorder, and he prescribed the following: (1) transfer plaintiff to his home unit (from main medical); (2) increase plaintiff's Topamax to one hundred fifty (150) milligrams, twice per day for six months; (3) lab work, including complete blood count ("CBC"), complete metabolic panel ("CMP"), Dilantin level, and thyroid stimulating hormone ("TSH"); (4) a Utilization Review ("UR") request for a follow-up appointment at the neurology clinic in three months; and (5) UR request for a head CT scan in two and one half months. Id. The appointment for the CT scan was scheduled for December 12, 2008, and a follow-up appointment at the neurology clinic was scheduled for February 3, 2009. Id. Plaintiff's lab results were within normal limits. Id. ¶ 9.

On October 16, 2008, plaintiff was brought to main medical because he was experiencing seizure activity. Id. ¶¶ 9, 10 and Ex. 5. Owens examined plaintiff and assessed him with seizure disorder. Id. ¶ 11 and Exs. 3, 6. Plaintiff was monitored throughout the remainder of the day, and no seizure activity was noted. Id. Plaintiff attended a follow-up appointment with Physicians Assistant Glen Williams ("Williams") on October 21, 2008, who noted that plaintiff had no new complaints. Id. ¶ 12 and Exs. 5, 7. Williams scheduled a follow-up appointment in eight weeks. Id.

On October 29, 2008, plaintiff submitted a sick call request seeking renewal of his Vicodin prescription for his chronic headaches. Id. ¶ 15 and Ex. 9. Owens submitted an order for Vicodin, but noted that he was reducing plaintiff's Vicodin on a trial basis. Id. Owens also submitted a UR request for Clonazepam (seizure control medication) for three milligrams by mouth, three times per day for one year. Id. The UR request was approved. Id.

On November 14, 2008, Owens conducted a review of plaintiff's chart and noted that he was requesting an increase in his Vicodin. Id. ¶ 21 and Ex. 14. Owens further noted that, in his medical

8

opinion, plaintiff was drug seeking and that plaintiff should use his Tylenol as needed. Id. Finally, Owens noted that plaintiff had been referred back to the neurology clinic and that his narcotics needed to be limited, if possible, because he was a fall risk. Id.

On December 2, 2008, Owens conducted a review of plaintiff's chart and noted that he had been seen at the Pitt County Memorial Hospital Emergency Department, on November 29, 2008, for a seizure. Id. ¶ 24 and Exs. 14 and 15. Owens then adjusted plaintiff's Dilantin dose. Id.

Plaintiff had a CT scan on December 12, 2008.[7] Id. ¶ 26. On January 9, 2009, Owens saw plaintiff after plaintiff had a seizure. Id. ¶ 31. Owens ordered that plaintiff be monitored in the main medical unit. Id.

On February 3, 2009, Dr. John Mann ("Mann") at the neurology clinic saw plaintiff for his scheduled follow-up appointment at the Central Prison Neurology Clinic. Id. ¶ 35. Mann noted plaintiff's history of seizures for the past four years. Id. Mann further noted that plaintiff's seizures lasted between five to thirty (30) minutes, occurred at any time, and happened about three times per week. Id. Mann also noted plaintiff's history of headaches noting that he was sensitive to light, which increased his headaches. Mann noted that Vicodin was not relieving plaintiff's complaints. Mann's impression was seizure disorder, and chronic daily headache. Mann's plan included: (1) increasing Vicodin 5/325 for headaches to two tablets twice per day; (2) continue Dilantin for seizures; (3) move all Topamax doses to bedtime; and (4) discontinue daytime Topamax doses. Id. Owens subsequently implemented Mann's recommendations, and scheduled a follow-up appointment in the neurology clinic in three months. Id. ¶ 36.

---

[7] Owens states that a diligent search was made to locate the results of his December 12, 2008, CT scan. Owens states that although the records were requested, the CT scan report was not provided to his counsel. Owens Aff. ¶ 26.

On March 17, 2009, Owens examined plaintiff in response to his sick call request asking to be seen by a neurologist. Id. ¶ 40 and Ex. 29. Plaintiff complained of difficulty walking, fatigue, urinary incontinence, and dizziness. Id. Owens' assessment was chronic headaches and seizures. Id. Owens increased plaintiff's Vicodin to three times per day for two months. Id. The next day, in response to a report of a seizure, Owens ordered a basic metabolic panel ("BMP"), and wrote an order to check both plaintiff's Dilantin and Topamax levels. Id. ¶ 42 and Exs. 29, 30.

On March 20, 2009, Owens reviewed plaintiff's chart, including his recent lab work. Id. ¶ 44 and Exs 30, 32. Plaintiff's BMP was within normal limits. Id. Owens noted that plaintiff's Dilantin level was slightly high. Id. Owens decided to monitor plaintiff's Dilantin levels and to repeat a check in two weeks. On April 2, 2009, Owens noted that plaintiff's Dilantin levels had increased, and Owens decreased plaintiff's Dilantin prescription. Id. ¶ 48 and Exs 34, 35. On April 20, 2009, Owens noted that plaintiff's Dilantin levels were normal. Id. ¶ 50. On April 28, 2009, Owens increased plaintiff's Vicodin in response to plaintiff's request for stronger pain medication. Id. ¶ 51.

On May 12, 2009, plaintiff attended his follow-up appointment with Mann at the Central Prison Neurology Clinic. Id. ¶ 54. Mann's impression was seizure disorder. Id. Mann recommended that plaintiff continue Dilantin at the current dose for one year, in addition to adding Keppra and either Tizanidine or Baclofen. Id. Finally, Mann requested a follow-up appointment within four months. Id. Owens subsequently implemented Mann's recommendations.[8] Id. ¶ 55.

---

[8] Owens noted that Mann wanted plaintiff to take Keppra. However, Owens was not sure whether Mann knew that plaintiff also was on Topamax at bedtime and Clonazepam for seizures. Owens further noted that Mann suggested Baclofen or Tizanidine at bedtime. Id. ¶ 55. However, Owens did not feel that these medications were indicated because he was already on Clonazepam. On May 15, 2009, Owens prescribed plaintiff Keppra. Id. ¶ 56.

10

On June 16, 2009, plaintiff complained of headaches and neck pain. Id. ¶ 60. In response, Owens scheduled a CT scan and a follow-up appointment with the University of North Carolina Neurology Clinic. Id.

On August 18, 2009, Owens reviewed plaintiff's chart, including the results of his CT scan. Id. ¶ 66 and Ex. 50. Plaintiff's CT scan showed a slightly smaller porencephalic cyst with slightly increased extra axial fluid collection posterior to the cyst. Id. There was no evidence of intracranial hemorrhage, infarct, or fractures. Id. Owens reported the results to plaintiff on August 20, 2009. Id. ¶ 67 and Ex. 50, 51. Plaintiff complained of continued headaches. Id. Owens ordered the following: (1) diapers to use one per night for six months; (2) Methadone ten (10) milligrams three times per day for one year; (3) discontinue Vicodin when Methadone is started; and (4) Vicodin 5/500, two tablets four times per day for two months. On September 10, 2009, Owens reviewed the results from plaintiff's recent laboratory tests, and noted that the results generally were normal. Id. ¶ 70.

On February 9, 2010, plaintiff saw Mann in the Central Prison Neurology Clinic. Id. ¶ 94. Mann noted plaintiff was taking Keppra and Dilantin, and that he had seizures approximately seven times per week. Id. and Ex. 71. Mann also noted that plaintiff had frontal headaches and blackout spells. Id. Mann suggested the following: (1) a CT scan (without contrast) of plaintiff's head; (2) continuing Dilantin at one hundred (100) milligrams in the morning and two hundred (200) milligrams at night for one year; (3) continuing Topamax at an increased dosage of three hundred fifty (350) milligrams at bedtime for one year; (4) continuing Keppra and Klonopin at current levels for one year; (5) checking levels of medications every three months for one year; and (6) checking electrolytes, including calcium, magnesium and phosphorous every three months for one year. Id.

11

In response, Owens implemented Mann's recommendations and scheduled a follow-up appointment at the neurology clinic in three months. Id.

On March 15, 2010, Owens reviewed plaintiff's chart, including the results from his recent lab work and CT scan. Id. ¶ 99 and Exs. 74, 78. Plaintiff's lab results were normal. Id. Plaintiff's CT scan results showed a large porencephalic cyst, a VP shunt, a hypodense subdural collection on the left. Id. Owens wrote an order to obtain a copy of plaintiff's July 2009, CT head scan from the University of North Carolina and to have it sent to Dr. Kevin Cregan at Wayne Memorial Hospital to compare plaintiffs March 12, 2010, CT scan. Id.

On April 27, 2010, Owens saw plaintiff in the medical clinic to review the results of plaintiff's CT scan. Id. ¶ 107 and Exs. 79, 81. Owens informed plaintiff that there was no real change in his cyst. Id. Plaintiff complained of severe headaches. Id.

On May 11, 2010, Mann examined plaintiff at the neurology clinic. Id. ¶ 109 and Ex. 84. Mann noted that plaintiff reported having daily syncopal spells with blackouts lasting twenty (20) second, which resulted in falls and injury. Id. Mann also noted that plaintiff was experiencing total bowel and urinary incontinence. Id. Mann noted that plaintiff's recent CT scan showed a porencephalic cyst on the left post hemisphere and right subdural collection but no mass effect or shift. Id. Mann recommended: (1) continue Dilantin one hundred (100) milligrams every morning, three hundred (300) milligrams every night for one year; (2) increase Topiramate to four hundred (400) milligrams every day at bedtime for one year; (3) continue Keppra one hundred (100) milligrams, twice per day for one year; and (4) check levels of these three medications one month before his next visit. Id. Mann also requested a follow-up appointment with plaintiff in nine months. Id.

12

On May 12, 2010, Owens reviewed plaintiff's chart, including a review of Mann's notes from his appointment with plaintiff in the neurology clinic. Id. ¶ 110 and Exs. 81, 84. Owens noted that plaintiff had developed elevated blood levels on the dosage of Dilantin recommended by Mann. Id. Accordingly, Owens planned to increase plaintiff's Topiramate and to check his levels in four weeks before increasing his Dilantin. Id. Owens also scheduled plaintiff's follow-up neurology clinic appointment. Id.

## DISCUSSION

A.  Motion to Appoint Counsel

There is no constitutional right to counsel in civil cases, and courts should exercise their discretion to appoint counsel for pro se civil litigants "only in exceptional cases." Cook v. Bounds, 518 F.2d 779, 780 (4th Cir. 1975). The existence of exceptional circumstances justifying appointment of counsel depends upon "the type and complexity of the case, and the abilities of the individuals bringing it." Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. of Iowa, 490 U.S. 296 (1989) (quoting Branch v. Cole, 686 F.2d 264 (5th Cir. 1982)); see also Gordon v. Leeke, 574 F.2d 1147, 1153 (4th Cir. 1978) ("If it is apparent . . . that a pro se litigant has a colorable claim but lacks capacity to present it, the district court should appoint counsel to assist him.").

Plaintiff asserts that he is unable to defend himself without counsel due to the fact that he is mentally disabled and incompetent due to the cyst on his brain. Plaintiff, however, admits that he has read defendants' motions for summary judgment. Moreover, plaintiff has filed a clear complaint, as well as other filings. It appears from these pleadings that, to the extent plaintiff is unable to prepare pleadings on his own, he has secured competent assistance. Accordingly, the court finds that

13

plaintiff has the capacity to proceed on this claim without the appointment of counsel. See Harris v. Salley, 339 Fed. Appx. 281, 2009 WL 2358852, at *2 (4th Cir. Aug. 3, 2009) (finding appointment of counsel not required where the plaintiff's claims were not complicated and he demonstrated the capacity to present those claims adequately in his court filings). As such, this case is not one in which exceptional circumstances merit appointment of counsel. Therefore, plaintiff's motion to appoint counsel is DENIED.

B. Motions for Summary Judgment

1. Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

2. Analysis

a. Exhaustion of Administrative Remedies

Micklos raises the affirmative defense that plaintiff failed to exhaust his administrative remedies prior to filing this action. Title 42 U.S.C. § 1997e(a) of the Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing an action under

14

42 U.S.C. § 1983 concerning his confinement. Woodford v. Ngo, 548 U.S. 81, 83-85 (2006); see Jones v. Bock, 549 U.S. 199, 217 (2007) ("failure to exhaust is an affirmative defense under [42 U.S.C. § 1997e]"); Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 683 (4th Cir. 2005). The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see Woodford, 548 U.S. at 84. Exhaustion is mandatory. Woodford, 548 U.S. at 85; Porter v. Nussle, 534 U.S. 516, 524 (2002) ("Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory."); Anderson, 407 F.3d at 677. A prisoner must exhaust his administrative remedies even if the relief requested is not available under the administrative process. Booth v. Churner, 532 U.S. 731, 741 (2001). "[U]nexhausted claims cannot be brought in court." Jones, 549 U.S. at 211.

The DAC has a three step administrative remedy procedure which governs the filing of grievances. See, e.g., Moore v. Bennette, 517 F.3d 717, 721 (4th Cir. 2008); Goulette v. Warren, No. 3:06CV235-1-MU, 2006 WL 1582386 (W.D.N.C. June 1, 2006). The DAC's administrative remedy procedure ("ARP") first encourages inmates to attempt informal communication with responsible authorities at the facility in which the problem arose. DAC ARP § .0301(a). If informal resolution is unsuccessful, the DAC ARP provides that any inmate in DAC custody may submit a written grievance on Form DC-410. DAC ARP § .0310(a). If the inmate is not satisfied with the decision reached at the step one level of the grievance process, he may request relief from the facility head. Id. at § .0310(b)(1). If the inmate is not satisfied with the decision reached by the facility head, he may appeal his grievance to the secretary of correction through the inmate grievance examiner. Id. § .0310(c)(1). The decision by the inmate grievance examiner or a modification by

15

the Secretary of Correction shall constitute the final step of the administrative remedy procedure. Id. § .0310(c)(6).

The evidence in the record reflects that plaintiff did not file any grievance relating to Micklos' medical treatment at Pender. Compl. Attach. However, plaintiff did file a grievance subsequent to his transfer from Pender to Maury complaining about the medical treatment provided for his cyst. The PLRA does not require that an inmate name particular individuals in his grievance. Moore, 517 F.3d at 727. Rather, all that is required is that a grievance provide a fair opportunity to address the issue that formed the basis of the lawsuit. Id. p. 729 (citation and quotation omitted). Here, there is a genuine issue of material fact with regard to whether the grievances plaintiff filed at Maury provided Micklos a fair opportunity to address plaintiff's allegations of inadequate medical treatment. Thus, Micklos' motion for summary judgment is DENIED as to this claim.

    2.    Deliberate Indifference to Plaintiff's Serious Medical Needs

Defendants assert the defense of qualified immunity. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity protects government officials "where the law is unsettled or murky." Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir. 2001). The test is whether the act was clearly forbidden, not whether in hindsight the action was wrongful. Id. at 286. The Fourth Circuit has recognized a two--pronged qualified immunity inquiry:

> First, we must decide whether a constitutional right would have been violated on the facts alleged. Next, assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right.

16

Bailey v. Kennedy, 349 F.3d 731, 739 (4th Cir. 2003) (internal quotations omitted). With respect to the second step, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was lawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001), receded from by, Pearson v. Callahan, 533U.S. 223 (2009). A court has discretion to decide which step of the two--prong test to analyze first. Pearson, 533 U.S. at 241.

The court first addresses whether defendants violated plaintiff's constitutional rights. To state a claim for relief under the Eighth Amendment of the United States Constitution, a plaintiff must establish that a prison official was deliberately indifferent to a serious condition, medical need, or risk of harm. See Short v. Smoot, 436 F.3d 422, 427 (4th Cir. 2006). "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.' " Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The Supreme Court has explained that the first prong is an objective one–the prisoner must show that "the deprivation of [a] basic human need was objectively 'sufficiently serious' "–and the second prong is subjective–the prisoner must show that "subjectively 'the officials act[ed] with a sufficiently culpable state of mind.' " See Strickler, 989 F.2d at 1379 (quotations omitted).

Defendants concede that plaintiff's medical condition constitutes a serious medical need for the purposes of this motion. The court now considers the second prong of the Eighth Amendment test–whether defendants acted with deliberate indifference. "Deliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions

17

for the very purpose of causing harm or with knowledge that harm will result." See Farmer v. Brennan, 511 U.S. 825, 835 (1994). It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Id. at 837; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). An inmate is not entitled to choose his course of treatment. See Russell v. Sheffer, 528 F.2d 318, 318-19 (4th Cir. 1975) (per curiam). Likewise, mere negligence or malpractice in diagnosis or treatment does not state a constitutional claim. Estelle v. Gamble, 429 U.S. 97, 105-106 (1976); Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998).

Plaintiff's chief complaint is that defendants acted with deliberate indifference by failing to follow his neurosurgeon's recommendation to remove the intracranial cyst on his brain.[9] The evidence in the record, however, reflects that plaintiff saw a neurologist on a regular basis, and that no neurosurgeon or neurologist recommended that he receive surgery while in the care of either Owens or Micklos. Owens Aff. ¶ 117 and Micklos Aff. ¶ 44. Contrarily, plaintiff's medical records contain a notation from a neurosurgeon stating that plaintiff was not considered a neurosurgery candidate. Micklos Aff. ¶ 44. Thus, defendants did not act with deliberate indifference to plaintiff's alleged neurosurgeon's recommendation for surgery.

Regarding defendants' care of plaintiff's cyst, the record reflects that both Owens and Micklos provided regular care for plaintiff's condition. For instance, Owens saw plaintiff on at least thirty (30) occasions and performed chart reviews of his medical record on at least forty-eight (48) occasions for complaints related to his neurological condition. Owens Aff. ¶ 117. The record further reflects that plaintiff was referred to and treated at the neurology clinic on at least four occasions,

---

[9] Plaintiff was diagnosed with the intracranial brain cyst and/or a neurological condition causing headaches and seizures prior to the time periods during which Micklos or Owens treated him. Owens Aff. ¶ 5.

and underwent at least two CT scans of his head. Id. The CT scans did not reveal any acute brain hemorrhage and indicated a lesion of stable (or reduced) size. Id. Finally, the record reflects that Owens prescribed plaintiff various medications in response to his complaints of chronic headaches. Id.

As with Owens, the record reflects that Micklos provided plaintiff with regular treatment for his condition and that he reviewed the recommendations of plaintiff's neurologist and other treating physicians. Specifically, the record reflects that Micklos examined plaintiff on twelve (12) occasions while plaintiff was at Pender, and that he referred plaintiff to the neurology clinic on at least four occasions. Micklos Aff. ¶ 44. Plaintiff also had two CT scans of his head. Id. Plaintiff's CT scans did not reveal acute brain hemorrhage and indicated a lesion of stable size. Id. Further, plaintiff's medical records reflect that plaintiff was noncompliant with his course of medical treatment on more than one occasion. Finally, the record reflects that Micklos prescribed plaintiff various medications in response to his complaints of chronic headaches.

Although plaintiff asserts that the efforts of Owens and Micklos in treating his medical needs were not effective, the fact that their treatment of him was not effective does not give rise to a constitutional violation. See e.g., Russell, 528 F.2d at 319; Starling v. United States, 664 F. Supp. 2d 558, 569-70 (D.S.C. 2009); see also, Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998) (finding that negligent acts are not sufficient to establish a constitutional violation). Moreover, plaintiff's request for surgery on his cyst amounts to nothing more than a disagreement over the proper course of treatment. See e.g., Russell, 528 F.2d at 319. It is well settled that such a disagreement does not constitute an Eighth Amendment claim. See Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985). Therefore, plaintiff has not established the subjective element of his Eighth

Amendment deliberate indifference claim, and there is no constitutional violation. Based upon the foregoing, Owens and Micklos are entitled to qualified immunity for plaintiff's claim, and his motion for summary judgment is GRANTED.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to appoint counsel (DE # 67) is DENIED. Defendants' motions to file excess pages (DE #s 57, 58) are GRANTED. Defendant Micklos's motion for summary judgment (DE # 59) is DENIED with regard to the exhaustion of administrative remedies argument, but is GRANTED as to the defense of qualified immunity. Defendant Owens's motion for summary judgment (DE # 63) is GRANTED.

SO ORDERED, this the 21 day of August, 2012.

_____
LOUISE W. FLANAGAN
United States District Judge